**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**JACQUELINE DELAPAZ,**

     **Plaintiff,**

**v.**                              **Case No. 3:12cv215/MW/CJK**

**CAROLYN W. COLVIN,**
**Commissioner of Social Security,**[1]

     **Defendant.**
_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D) and 72.3, relating to review of administrative determinations under the Social Security Act (Act) and relating statutes, 42 U.S.C. §§ 401-1400v.  The matter is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant's application for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et. seq*.

     Upon review of the record, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), she therefore is automatically substituted for Michael J. Astrue as the Defendant in this case.

decision of the Commissioner, therefore, should be affirmed and claimant's application for benefits should be denied.

## PROCEDURAL HISTORY

Claimant Jacqueline Delapaz, who will be referred to by name, as plaintiff, or as claimant, filed her application for SSI on September 25, 2006, alleging disability beginning on December 7, 2004. Plaintiff's claim initially was denied and, upon reconsideration, the denial was upheld. Ms. Delapaz appeared before an Administrative Law Judge (ALJ) for a hearing on October 17, 2008; she appeared for a supplemental hearing several months later. The ALJ likewise denied benefits. Claimant petitioned the Appeals Council of the Social Security Administration (Appeals Council) for a review of the ALJ's decision. Her petition was granted, and the Appeals Council vacated the ALJ's decision and remanded the matter for further consideration. Another hearing was held on remand and then continued so that a consultative examination could be conducted. The claim was then assigned to a new ALJ, who held a supplemental hearing and issued a final determination finding that the claimant was not disabled under the Act. The Appeals Council denied plaintiff's petition for further review; as a result, the ALJ's order on remand became the final decision of the Commissioner. It is from that decision that the plaintiff appeals.

## FINDINGS OF THE ALJ

In the written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

• The claimant has not engaged in substantial gainful activity since September 25, 2006, the application date.

Case No. 3:12cv215/MW/CJK

• The claimant has the following severe impairments: fibromyalgia (FM), migraines, anxiety, insomnia, depression, idiopathic neuropathy, somatic dysfunction, annular tear LS and myoclonic jerks (20 C.F.R. § 416.920(c)).

• The claimant has the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 416.967(b).

• The claimant has no past relevant work (20 C.F.R. § 415.965).

• Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969, 415.969(a)).

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181

(11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Thus, although review is deferential, the reviewing court conducts "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[2]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at

---

[2] The Eleventh Circuit not only speaks of independent review of the administrative record, but it reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

§ 1382c(a)(3)(B). Pursuant to 20 C.F.R. § 416.920(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that prevents her from performing her past work. *See* 20 C.F.R. § 416.912. The Eleventh Circuit has explained the operation of step five. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove

that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).").

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[3] "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[4] 20 CFR

---

[3] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20 C.F.R. § 416.920(a)(4).

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 416.912(c).) However, before we make a determination that you are not disabled, we are responsible for

§ 416.945(a)(1).  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict which leads, as in this case, to the points raised on judicial review by many disappointed claimants.

## FACTUAL BACKGROUND AND MEDICAL HISTORY

At the time of the September 2010 hearing, Ms. Delapaz was forty-five years old and a mother of three daughters.[5]  T. 36, 401.  She graduated from high school and completed some college but she never received a college degree.  T. 37, 291.  In 1999, plaintiff quit her job at Holiday Inn Express because of difficulty standing.  T. 41.  She contends that she is unable to work at a sitting job because of "constant pain, too many migraines, and weakness in [her] knees."  T. 42.  Claimant claims to experience migraines twice a month and to be essentially incapacitated during that time.  T. 48-49.  In addition, she has "neurological pains that have gotten worse over the years" and now experiences tremors, stiffness, and hardening in her muscles

---

developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 416.912(d) through (e).)  We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations.  (See § 416.913.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

[5] The court's recitation of the facts and medical history is based on its independent review of the record.  *See Tieniber*, 720 F.3d 1251 (11th Cir. 1983)

Case No. 3:12cv215/MW/CJK

which causes her right and left sides to be weak.[6] T. 42, 47-50. On a typical day, plaintiff reads, meditates, and cooks herself meals, but at a very slow pace. T. 44. She tends to her own laundry, but describes this as an arduous task that involves a lot of "squatting." T. 45-46. She has had problems gripping and holding onto items since 2003. T. 52. To alleviate some of her pain, she props her legs on a sofa six times a day, for twenty to forty-five minutes each time. T. 54. She also lies on her left side one to four times a day, for forty-five minutes to two hours at a time, and on her right side two times a day. T. 56, 401. She claims that she cannot bathe "as often as most people do." T. 59.

At the hearing, a vocational expert (VE) testified. T. 59-68, 208-10, 253-54, 258-59. He stated that plaintiff's work history included "a lot" of part-time jobs, including as a clerical assistant, billings collection clerk, data entry clerk, and receptionist. T. 61, 288, 293. The VE advised that Ms. Delapaz could perform a significant number of unskilled sedentary jobs, such as office clerk/hand mounter and surveillance monitor. T. 65.

## A.     Relevant Physical Medical History

On June 26, 2004, Ms. Delapaz visited Jung Gorton, M.D., and reported that she had been diagnosed with fibromyalgia (FM) "some time after 9-11" and "feels mentally inferior to others but is not depressed." T. 401-02. Dr. Gorton diagnosed plaintiff with morning stiffness, myalgia, and arthralgia and ruled out rheumatoid

---

[6] Claimant described the pain as a "seven or eight" on a ten-point scale. She also stated that she walks approximately a quarter mile each day to loosen the stiffness in her muscles. T. 43, 57.

arthritis, fatigue, and tobacco abuse.[7]  T. 402.  Dr. Gorton advised claimant to diet and exercise.  T. 400.  The next time Ms. Delapaz saw Dr. Gorton, on August 6, 2004, he noted that she was responding positively to her medication.  T. 398.  He also found that she was "in no acute distress," but was "tender in numerous tender points consistent with FM."  T. 398.  Dr. Gorton thus diagnosed plaintiff with FM.  T. 398. He reiterated that diagnosis the next time he saw plaintiff, on April 22, 2005, noting "FM, right lower extremity weakness, which resulted in weak bilateral hand gripping on her right side, and possible early neuropathy."  T. 396.  He scheduled the plaintiff for an MRI of her lumbar spine on May 17, 2005; he also prescribed her Xanax, Elavil, and Imitrex and referred her to a  rheumatologist for FM, neurology, and generalized aches and pains.  T. 396.  The MRI revealed "disc narrowing, desiccation, mild bulging at LF-S1, and a central annual tear with minimal bulging at L4-L5," none of which accounted for plaintiff's symptoms, according to Dr. Gorton.  T. 384, 395-96.  A subsequent MRI of plaintiff's cervical spine revealed a small midline protrusion at C4-C5 that did not deform her cord; there were no other "signal abnormalities."  T. 403.

On June 14, 2005, Ms. Delapaz again visited Dr. Gorton, complaining of muscle aches, weak legs, and numbness and spasms in her right arm and hand.  T. 394.  Dr. Gorton diagnosed plaintiff with "FM, lumbar radiculopathy, possible right carpal tunnel syndrome, and right lateral epicondylitis" and prescribed her Elavil, Effexor, and Xanax, as well as physical therapy.  T. 394.  In addition, he completed a *Medical Verification Form*, restricting plaintiff to eleven to twenty hours of work

---

[7]  Plaintiff's laboratory results indicated "negative rheumatoid factors, ANA, and sedimentation rate."  T. 400

and less than ten hours of other activity per week, with no lifting of more than five pounds. T. 388. The following month, plaintiff reported that she was working full-time and thus had been unable to continue physical therapy. T. 393. As of March 6, 2006, however, she had "miraculously improved" and was "off most of her medications." T. 393. Dr. Gorton reiterated plaintiff's FM diagnosis on that date but noted that she was in "no acute distress." T. 392. In fact, he advised that plaintiff could return to work "full duty, without restrictions." T. 392.

In November 2006, plaintiff had an appointment with Michael Kasabian, D.O. T. 412. Like Dr. Gorton, Dr. Kasabian diagnosed plaintiff with FM. T. 412. He also noted that she had "atypical chest pain and migraines" but found "5/5 muscle strength in all four extremities, the ability to stand on heels and toes, no muscle atrophy or asymmetry, normal fine grip dexterity, and normal grip strength." T. 411-12. He further noted that claimant "walks without an assistive device" and has "no limp." T. 412. Plaintiff again was diagnosed with FM when she visited Escambia Community Clinic (ECC) on February 23, 2007; she also was prescribed medication to treat the condition. T. 452-55. She returned to ECC on March 15, 2007 – this time, for treatment of pharyngitis. T. 512-16. She returned again on April 13, 2007, on which date she saw James Binkard, D.O., who reported "normal muscle strength in all extremities, a normal neurological gait, a normal attention span, and the ability to concentrate." T. 506-07. Dr. Binkard found that plaintiff's clinical exam results for coordination problems and leg weakness were not typical for FM. T. 506, 508, 510. The next time plaintiff saw Dr. Binkard, on August 9, 2007, she asked him to complete a form attesting that she was unable to work as a result of FM. Dr. Binkard refused to sign the form and opined that if plaintiff was disabled, it was because of

psychological reasons, not physical stress. T. 500-01. He encouraged plaintiff to try "reasonable work." T. 501.

Plaintiff next visited ECC on November 10, 2008, at which time she saw Manuel Abendan, M.D., and complained of severe headaches, generalized muscle tenderness, and panic attacks. T. 611. Dr. Abendan diagnosed plaintiff with "FM and migraine." T. 611. Plaintiff saw Dr. Abendan again on February 6, 2009, to discuss low blood pressure, head congestion, and a diet plan. T. 608-10. Dr. Abendan did not note any complaints of muscle pains or aches during that visit and diagnosed plaintiff with "idiopathic peripheral neuropathy." T. 608-10. Plaintiff returned to ECC less than two months later, complaining of ear pain and migraine headaches. T. 601-02. She was treated by Cathy Voght, an Advanced Registered Nurse Practitioner, and diagnosed with sinusitis. T. 602. She returned to ECC approximately six weeks later and was diagnosed by Dr. Abendan with muscle tenderness, sinusitis, nos, FM, headache, tension, neuropathy and idiopathic peripheral nos. T. 599. Again, Dr. Abendan did not note any complaints of backache or muscles pains. T. 598. On July 28, 2009, claimant visited an emergency room for treatment of headaches. T. 733-42.

Claimant next saw Dr. Abendan in August 2009, on which date he diagnosed her with FM, sinusitis, and acute nos. T. 687-89. At the end of August, plaintiff sought treatment in an emergency room for a cough and sore throat and was diagnosed with bronchitis and bronchospasm. T. 632-36. During a November 6, 2009, appointment with Voght and a February 5, 2010, appointment with Dr. Abendan, claimant was diagnosed with neuropathy and headache. T. 725, 745-47. Similarly, on March 9, 2010, Dr. Abendan diagnosed plaintiff with "neuropathy,

idiopathic peripheral, headache and tension." T. 755. A month later, on April 7, 2010, he diagnosed her with "headache, neuropathy and osteoarthrosis." T. 777-78.

Shortly thereafter, plaintiff requested a consultative neurological evaluation, which was performed by Dale K. Johns, M.D., on June 2, 2010. T. 758-69. At that time, Ms. Delapaz complained of "shooting pains in her legs, shaking and jerking of legs and arms, tremors in her hands and feet and migraines two or three times monthly." T. 758-59. She also complained of "numbness and weakness in her hands, neck pains, a tender right shoulder, constant lower back pain, fatigue, sharp pains in hips, and loss of strength in her right wrist." T. 758-69. Dr. Johns questioned plaintiff's diagnosis of FM, finding "multiple pain complaints in her lower back, but no evidence of seizure activity causing the movements, and undetermined etiology of the myoclonic jerks." T. 763. Dr. Johns opined that claimant could occasionally lift/carry up to thirty pounds and frequently lift/carry up to ten pounds. T. 764. He also thought claimant could sit for eight hours, stand for four hours, and walk for three hours in an eight-hour workday. T. 765. The following month, Ms. Delapaz visited ECC for a routine check-up, complaining of generalized muscle tenderness. T. 773-75. Dr. Abendan evaluated plaintiff and found no swelling or inflamation of the muscles. T. 775.

## B. State Agency Physical Medical Evidence

On March 15, 2007, John Dawson, M.D., a state agency consultant, reviewed Ms. Delapaz's file and completed a physical residual functional capacity assessment. T. 458-65. Dr. Dawson concluded that plaintiff's FM and other conditions did not preclude her from performing medium work involving balancing, stooping, crawling, crouching, climbing, or kneeling, but limited her to frequent lifting of up to twenty-

five pounds, occasional lifting of up to fifty pounds, and standing and sitting for six hours in an eight-hour workday.  T. 459.  Dr. Dawson found inconsistent diagnostic criteria for myofascial pain.  T. 459-62.  Plaintiff's file was reviewed again in November 2009 by Clarence Louis, M.D., another state agency consultant.  T. 696-703.  Dr. Louis opined that plaintiff's FM, carpal tunnel syndrome, and history of migraine headaches did not prevent her from performing the full range of light work. T. 696-700.  Like Dr. Dawson, Dr. Louis found that plaintiff's condition allowed her to frequently lift up to twenty-five pounds and occasionally lift up to fifty pounds and sit for six hours in an eight-hour workday.  T. 697.  Dr. Louis concluded that claimant had no manipulative, visual, communicative, or environmental limitations.  T. 696-700.  In so finding, Dr. Louis partially credited plaintiff's complaints of distress due to carpal tunnel syndrome, migraines, FM, and back pain.  T. 701.

## C.  Relevant Mental Medical History

In December 2006, Susan Danahy, Ph.D., a licensed psychologist, conducted a consultative evaluation of plaintiff at the request of the SSA's Division of Disability Determinations.  T. 416-20.  Although Dr. Danahy found "nothing to suggest a thought disorder, including hallucinations or delusions," she diagnosed plaintiff with mood disorder, panic disorder with agoraphobia, and somatization disorder and assigned Ms. Delapaz a global assessment of functioning (GAF) of 50.[8]  T. 418-

---

[8]  Formerly, a GAF between 51 and 60 was considered to indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).  The most recent edition of the Diagnostic and Statistical Manual, however, no longer recommends the use of the GAF scale, noting that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th

19. The following month, Ms. Delapaz visited Lakeview Center, seeking treatment for panic disorder and depression. T. 437-38. She was diagnosed with panic disorder with agoraphobia and depressive disorder and assigned a GAF of 45. T. 437-38. Several months later, on April 12, 2007, Edwin Gomez, M.D., performed a psychiatric evaluation of plaintiff. T. 480-82. Dr. Gomez diagnosed Ms. Delapaz with major depressive disorder without psychotic features and borderline personality disorder and assigned her a GAF of 50. T. 481. In December 2008, Frank Brown, Ph.D, a licensed psychologist, conducted another consultative evaluation of Ms. Delapaz at the request of the Division of Disability Determinations. T. 585. Dr. Brown found that plaintiff was "not suicidal and [did] not feel useless or hopeless, or have thoughts of social withdrawal." T. 588. He administered the plaintiff a MMPI-2, which resulted in an invalid profile - - according to Dr. Brown, because plaintiff did not give her best effort and answered in an exaggerated way, endorsing the most extreme symptoms and attitudes. T. 588. Dr. Brown diagnosed claimant with generalized anxiety disorder and adjustment disorder with depressed mood and assigned her a GAF of 55. T. 588. According to Dr. Brown, plaintiff's mental disorders had only a moderate impact on her social and occupational functioning. T. 588.

Again at the request of the Division of Disability Determination, Dr. Abendan completed a *Supplemental Mental Impairment Questionnaire* for the claimant in June 2009. Dr. Abendan indicated that Ms. Delapaz did not have a mental impairment that significantly impaired her daily functioning. T. 624. Plaintiff underwent an additional consultative evaluation a couple of months later by John Duffy, Ph.D.,who diagnosed

---

ed. 2013). Because the claimant did not rely on her GAF in support of her claim, the court will not address it further.

Case No. 3:12cv215/MW/CJK

her with depressive disorder, NOS, adjustment disorder with anxiety, and somatoform disorder and assigned her a GAF of 50. Dr. Duffy concluded that plaintiff's "constellation of preoccupation with physical concerns and her mixed depression and anxiety . . . create[d] significant problems for her and appear[ed] to be reflecting her initiative and motivation to make decisions that might clearly benefit her." T. 628.

## D. State Agency Mental Medical Evidence

Robert Schilling, Ph.D., a psychiatrist, reviewed Ms. Delapaz's file on December 14, 2006. T. 423-36. Dr. Schilling concluded that plaintiff's affective disorder did not constitute a severe impairment and, instead, caused only mild restrictions on plaintiff's daily living activities, ability to concentrate, and ability to maintain social functioning. T. 423, 433. Several months later, on March 21, 2007, James Meyers, Psy.D., reviewed claimant's file. T. 466-79. Dr. Meyers diagnosed plaintiff with somatization disorder, panic disorder with agoraphobia, and mood disorder. T. 469, 471-72. Like Dr. Schilling, Dr. Meyers found that Ms. Delapaz's affective disorder and anxiety-related disorders were not severe and caused only a mild restriction in her daily activities and ability to maintain social functioning. T. 566. Dr. Meyers also found "no episode of decompensation of extended duration." T. 476. Claimant's file was reviewed again in September 2009 – this time by Robert Stainback, Ph.D. T. 637-54. Dr. Stainback concluded that Ms. Delapaz's affective disorder, anxiety-related disorder, and somatoform disorder did not "prevent her from meeting the basic mental demands of work on a sustained basis" and that Ms. Delapaz "maintained the ability to perform simple, repetitive tasks." T. 627, 649, 653. Finally, Dr. Meyers reviewed plaintiff's file for a second time in December 2009 and likewise concluded that plaintiff's affective disorder "did not preclude her from meeting the

basic mental demands of work on a sustained basis."   T. 704, 720, 747.

**ANALYSIS**

Plaintiff argues that the ALJ did not adequately evaluate her FM condition as a medically determinable impairment (MDI) in accordance with Social Security Ruling (SSR) 12-2p, which provides policy guidance as to the evaluation of disability claims based on FM.[9]  Plaintiff devotes the majority of her brief to discussing the symptoms of FM, arguing that, in her case, it constitutes an MDI.   Conspicuously, however, plaintiff fails to note that the ALJ in fact determined that Ms. Delapaz had an MDI of FM, and that it met the test for a severe impairment.  Plaintiff thus has wholly failed to demonstrate error in that regard.   Plaintiff also mentions that the ALJ did not expressly consider SSR 12-2p in determining whether she was disabled.  Although the plaintiff is correct in her contention in that regard (the subject ruling did not exist at the time), she has not demonstrated any error resulting from the ALJ's failure to expressly address SSR 12-2p.  Indeed, plaintiff has not identified a single step of the sequential process the ALJ failed to consider, much less demonstrated the manner in which consideration of such unidentified step would have changed the ALJ's decision. Instead, plaintiff simply states in a conclusory fashion that the ALJ did not properly apply the sequential evaluation process, which is insufficient to meet her burden of

---

[9] SSR 12-2p was issued on July 25, 2012, after plaintiff's claim was decided.   It "provides that once a claimant is determined to have fibromyalgia her statements about symptoms and functional limitations are to be evaluated according to the two-step process set forth in SSR 96–7p." *Tully v. Colvin*, No. No. CV–11–00396–CI, 2013 WL 1859405, at *7 (E.D. Wash. Apr. 30, 2013). "SSR 12–2p  *Id.*  "These policies provide that '[i]f objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all other evidence in the case record.'" *Id.* (quoting SSR 12–2P); *see also* Evaluation of Fibromyalgia, 77 Fed. Reg. 43,640 (July 25, 2012).

proof on appeal.[10]

Based on the foregoing analysis, I find the ALJ's decision to be in compliance with appropriate legal standards. *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

It is therefore respectfully RECOMMENDED:

The application for a period of disability and disability benefits be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 23rd day of July, 2013.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[10] The court notes that the ALJ's finding regarding claimant's RFC is supported by substantial evidence. Indeed, although plaintiff repeatedly was diagnosed with FM, there is no indication that the condition prevented her from performing light work. To the contrary, with one exception, each medical professional who examined the plaintiff concluded that she could work either with no restrictions or with restrictions allowing for at least light work. Although Dr. Gorton initially restricted plaintiff to eleven to twenty hours of work and less than ten hours of other activity per week, with no lifting of more than five  pounds, the plaintiff reported the next month that she was working full-time. And approximately nine months later, Dr. Gorton lifted all of plaintiff's work restrictions. The ALJ thus appropriately determined that plaintiff was capable of performing light work despite her FM. In so finding, the ALJ weighed plaintiff's subjective complaints against the objective medical evidence of record, thus complying with SSR 12-2p in that regard.

Case No. 3:12cv215/MW/CJK

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).